# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | | |
|---|---|---|
| T.M., | : | |
| **Plaintiff,** | : | |
| v. | : | No. 5:23-cv-287 (CHW) |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | Social Security Appeal |
| **Defendant.** | : | |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff C.M.'s application for benefits under Title II of the Social Security Act. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Plaintiff has not shown that the ALJ erred in discounting medical opinions related to Plaintiff's ability to reach and handle, that the Appeals Council erred in disregarding new evidence, or that the ALJ erred in discounting a medical opinion from Dr. Marion Lee. Accordingly, the Commissioner's decision is **AFFIRMED.**

## BACKGROUND

Plaintiff applied for a period of disability and disability insurance benefits on June 5, 2020, alleging a disability onset date of December 30, 2019. R. 301-302, 212. Plaintiff's claim was denied initially and upon reconsideration. R. 182-211, 214-25. After a hearing before the ALJ on

November 16, 2022, the ALJ denied Plaintiff's claim on January 30, 2023. R. 149-81, 18-34. Plaintiff's request for review was denied by the Appeals Council on July 17, 2023. R. 1-4. Plaintiff filed her complaint seeking judicial review of the final decision of the Commissioner on August 8, 2023. (Doc. 1).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments

in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

The medical record indicates that Plaintiff experienced significant neck and arm pain prior to her alleged onset date of December 30, 2019. R. 599-600. Plaintiff continued to work while having these problems, seeking first chiropractic care and then care with a sports medicine specialist, Dr. Celestine Nnaeto. R. 599, 624. Dr. Nnaeto referred Plaintiff for physical therapy in August 2019, but this therapy only exacerbated Plaintiff's symptoms. R. 624.

Plaintiff received an MRI of her cervical spine on September 24, 2019, which showed acute reversal of the cervical curvature at C5-6, suggesting a soft tissue injury or muscle space. R. 499. Plaintiff's cervical cord was impinged upon at C5-6, and the cord contained mild edema in that area. *Id.* The remainder of Plaintiff's cervical cord and her craniocervical juncture were unremarkable. Plaintiff had no paraspinal soft tissue pathology in her cervical region. *Id.* Plaintiff did have early to mild T2 signal loss at C5-6 with asymmetric disc space narrowing anteriorly, which resulted in kyphosis. *Id.* Early signal loss was present at her remaining cervical levels to variable degrees. *Id.* Plaintiff had no vertebral compression deformity or significant listhesis at any level, and no osseous lesions were appreciated. *Id.* Plaintiff had no disc herniation or significant acquired stenosis at C2-3, C3-4, or C4-5. *Id.* Plaintiff had relatively broad-based midline and right paracentral disc herniation of the protrusion type, which caused spinal canal stenosis and impingement of the cord at C5-6. *Id.* Plaintiff's AP thecal sac diameter in the midline

measured at approximately 5-6 millimeters, while her exit foramina were not directly compromised. *Id.* The imaging showed shallow spondylosis contributing to mild foraminal narrowing bilaterally in conjunction with disc space narrowing, and no obvious nerve root impingement was seen. *Id.* At C6-7, Plaintiff had broad-based posterior midline and left-sided disc herniation of the protrusion type which appeared shallow. *Id.* There was spinal canal stenosis, but no definite cord impingement was seen. *Id.* Plaintiff's AP thecal sac diameter just to the left of midline measured approximately 6 millimeters. *Id.* The extit foramen on her left side appeared moderately stenosed by spondylosis and early facet arthrosis as well as disc material while her exiting C7 nerve root exhibited signs that it may be impinged upon. *Id.* There was mild foraminal stenosis on the right side as well, secondary to mild bony changes and a shallow disc bulge. *Id.* Plaintiff's exiting nerve root on the right side might also have been irritated. *Id.* At C7-T1, Plaintiff had a posterior midline disc bulge with no apparent focal disc herniation. *Id.* Plaintiff's AP thecal sac diameter in the midline measured appropriately 9 millimeters, consistent with spinal canal stenosis. *Id.* Plaintiff had early to mild foraminal stenosis bilaterally, secondary to mild bony changes. *Id.* The remainder of Plaintiff's examination was unremarkable. *Id.*

At the end of 2019, Plaintiff received surgery to decompress her spinal cord at C5-6 and C6-7. R. 678-679. Although the surgery initially appeared successful, Plaintiff injured herself in February 2020 when Plaintiff attempted to stop her mother from falling while Plaintiff was still recovering from surgery. R. 711-12. Plaintiff's attempt exacerbated her neck injury and caused additional pain in her right arm and shoulder. *Id.*

Plaintiff had another MRI of her cervical spine on April 17, 2020. R. 507. This MRI demonstrated postsurgical changes with spaces within the C5-6 and C6-7 disc spaces. *Id.* Plaintiff had no abnormal signal intensity within the cervical cord at these disc positions, and the remaining

portions of the cord and craniocervical junction were unremarkable. *Id.* No paraspinal soft tissue mass was seen in the cervical region. *Id.* Plaintiff had straightening and mild reversal of the mid-cervical curvature, consistent with muscle spasm or recent soft tissue injury. *Id.* A similar appearance was present on the previous study from September 2019, although the degree of reversal of the curvature was less prominent in this examination. *Id.* Plaintiff had visible early T2 signal loss again at her remaining cervical levels, but no vertebral compression deformity or significant listhesis seen at any level. *Id.* Prominence of edenoidal tissue was noted, incidentally, with clinical correlation suggested. *Id.* Plaintiff had shallow spondylosis at C2-3, with an annular tear in the midline suggesting recent injury. *Id.* Plaintiff also had early facet arthrosis asymmetrically on her left side at this disc position. *Id.* At C3-4, Plaintiff had similar findings, and her AP thecal sac diameter in the midline measured 6-7 millimeters. *Id.* At C4-5, Plaintiff had shallow spondylosis and a very shallow disc bulge, but no disc herniation or significant interval change was appreciated. *Id.* At C5-6, Plaintiff exhibited postsurgical changes, including a lack of disc herniation noted on the previous examination. *Id.* Shallow spondylosis was again noted, with diffuse spinal canal stenosis secondary to shallow spondylosis, and impingement to the cord could not be excluded. *Id.* No cord edema was seen, and Plaintiff's AP thecal sac diameter measured at approximately 5-6 millimeters. *Id.* Plaintiff's spondylosis contributed to mild foraminal stenosis on the right side and early left foraminal narrowing, which was similar to findings in the previous examination. *Id.* At C6-7, Plaintiff had shallow spondylosis contributing to diffuse spinal canal stenosis, with no cord contact or impingement seen. *Id.* Plaintiff's AP thecal sac diameter in the midline measured at approximately 7 millimeters. *Id.* Spondylosis and early facet arthrosis contributed to mild to moderate foraminal stenosis on the left side and mild stenosis on the right side, and no significant change was appreciated from the last examination. *Id.* Plaintiff had a

spacer within this disc space, and no disc herniation or impingement was seen. *Id.* Plaintiff had a shallow disc bulge at C7-T1, with no disc herniation or significant acquired stenosis perceptible. *Id.* No other change was seen, and the remainder of Plaintiff's examination was unremarkable. *Id.*

Plaintiff also had an MRI of her right shoulder taken on April 17, 2020. R. 509. The examination showed that Plaintiff's teres minor tendon was intact, with tendinosis of the distal infraspinatus tendon present distally in a diffuse manner. *Id.* No tear was seen, and there was also diffuse tendinosis of the distal subscapularis without an obvious tear. *Id.* Diffuse tendinosis of the supraspinatus tendon was also present, and there was ill-defined inflammation throughout much of this tendon, consistent with tendinitis. *Id.* Plaintiff had a superimposed tear of the distal anterior tendon at its attachment to the humerus. *Id.* The partial tear involved a segment of the tendon measuring approximately 1 centimeter in diameter. *Id.* The tear was primarily mid-substance with some apparent involvement of the insertional fibers, but no definite involvement of the bursal surface was seen to confirm a full thickness tear. *Id.* The musculature of Plaintiff's rotator cuff was within normal limits. *Id.* The long head of Plaintiff's biceps tendon remained normally positioned within the bicipital groove, and the horizontal component overlying the lumeral head appeared intact. *Id.* Plaintiff's biceps anchor was also intact, and no labral tears were seen. The axillary pouch was also intact. *Id.* Plaintiff's acromion process had a very mild anterior and lateral downward sloping orientation, and mild degenerative and hypertrophic changes of the AC joint were present. *Id.* Minimal inflammatory changes were present, and the coracoacromial ligament and coracoclavicular ligaments were intact. *Id.* Plaintiff had a small amount of fluid present within her glenohumeral joint space, but no chondral defect or loose body

was seen. *Id.* Plaintiff had mild subacromial bursitis, and the rest of her examination was unremarkable. *Id.*

Plaintiff had an MRI taken of her lumbar spine on June 27, 2020. R. 517. The MRI showed exaggerated lordosis of the lumbar spine, decreased T2 disc signals from L2-L3 to L5-S1, and an approximately 5% decrease in vertebral body height in the anterior thirds of T7 vertebral body suggestive of mild chronic compression deformity. *Id.* Signal intensities of vertebral bodies were uniform, and Plaintiff's conus ended at T12-L1. *Id.* There were no focal abnormalities. *Id.* T10-T11 and T11-T12 showed that contours of posterior disc margins were maintained, and there was no significant spinal canal or neural foraminal stenosis, with no evidence of nerve root impingement. *Id.* T12-L1 showed a shallow disc bulge with no significant spinal canal neural foraminal stenosis and no evidence of nerve root impingement. *Id.* L1-L2 showed that the contours of the posterior disc margin were maintained and the spinal canal AP diameter in the midline was within normal ranges. *Id.* The bilateral neural foramina were relatively clear, as well. *Id.* L2-L3 showed disc bulge superimposed with central to left subarticular disc protrusion indenting the thecal sac and impinging on the left L3 nerve root, with mild to moderate stenosis spinal canal stenosis in the midline, mild bilateral neural foraminal stenosis, and mild to moderate bilateral facet joint arthrosis and bilateral ligamentum flavum hypertrophy. *Id.* L3-L4 showed disc bulge superimposed with left subarticular disc protrusion impinging on the left L4 nerve root, mild to moderate spinal canal stenosis in the midline, mild bilateral neural foraminal stenosis, and mild bilateral facet joint arthrosis. *Id.* L4-L5 showed disc bulge superimposed with right subarticular disc protrusion impinging on the right L5 nerve root, mild spinal canal stenosis in the midline, a combination of disc bulge and facet joint arthrosis resulting in mild to moderate bilateral neural foraminal stenosis irritating the bilateral L4 nerve roots, and moderate to advanced bilateral

facet joint hypertrophic arthropathy accompanied by subtle anterior displacement of L4 on L5.  *Id.*  L5-S1 showed a disc bulge superimposed with central disc protrusion contracting the thecal sac, mild spinal canal stenosis, right foraminal disc protrusion and facet joint arthrosis resulting in moderate to severe right neural foraminal stenosis impinging on right L5 nerve root, and moderate bilateral facet joint hypertrophic arthropathy.  *Id.*

On July 22, 2020, Plaintiff underwent orthopedic surgery to repair her torn infraspinatus, but this operation was aborted due to "technical difficulty secondary to her extreme morbid obesity."  R. 938.  During the same operation, Plaintiff underwent a carpal tunnel release, but her median nerve appeared slightly erythematous.  *Id.*

Plaintiff had a nerve conduction study on January 21, 2021.R. 1046, 1391.  Evaluation of Plaintiff's right median sensory nerve showed borderline conduction velocity, slow nerve conduction velocity in the palm to wrist segment of the right median sensory nerve.  R. 1046.  All remaining nerves were within normal limits.  *Id.*  Needle evaluation of the right biceps and the right triceps showed moderately decreased interference patterns, and the right deltoid muscle showed increased motor duration and decreased interference patterns.  *Id.*  All remaining muscles showed no evidence of electrical instability.  *Id.*  The impression of the examination was indicative of mild right carpal tunnel syndrome superimposed upon findings compatible with right C5-6 radiculopathy, but the examination could not distinguish among persistence of radiculopathy or arachnoiditis.  *Id.*  Clinical correlation was recommended.  *Id.*

Plaintiff was prescribed muscle relaxers and gabapentin for ongoing spasms and nerve pain from her neck down her arm.  R. 728-29.  Plaintiff's right infraspinatus showed significant weakness, and Plaintiff's shoulder was rated 3/5 in motor strength in all directions.  R. 528, 542-43.  Throughout 2021, Plaintiff continued to experience pain and motor difficulties as a result of

her injuries. Neurological examinations showed decreased range of motion in strength in Plaintiff's left shoulder, decreased range of motion in the right shoulder and wrist, and absent reflexes throughout her right and left upper extremities. R. 1039, 1388. Plaintiff's sleep was affected by the ongoing shoulder pain from her cervical disc surgery and torn rotator cuff. R. 1112. Similar findings regarding Plaintiff's decreased range of motion and weakness in her right bicep, upper extremities, and right shoulder occurred throughout 2022. R. 1946, 1961, 1391, 1378, 2144. Plaintiff had a limited range of motion in her right shoulder that reduced the strength of her right bicep; she experienced muscle spasms, tenderness, and paresthesia; she had decreased strength and a sensation of vibration in her left upper extremity; and her deltoid muscle strength was diminished on the right, along with her biceps and triceps muscle strength. *Id.*

Plaintiff's pain in her lower back had been ongoing for years before her alleged onset of disability date, but it increased in severity over time. R. 517. Plaintiff reported lower back pain in May 2020, September 2020, and January 2021, when she received Norco, steroids, and a topical analgesic for her lower back pain. R. 481, 615, 952. Plaintiff had positive straight leg raise tests and L4-L5 facet tenderness on the left in January and March 2022. R. 2008, 2054-55. Plaintiff was referred to sports medicine treatment on June 7, 2022, in part for her back pain, right leg pain, and numbness. R. 1378.

Plaintiff had an MRI of her lumbosacral spine on June 28, 2022. R. 1895. The MRI showed that Plaintiff's SI joints were maintained without ankylosis, her pedicles were intact, and there were no acute pars defects demonstrated. *Id.* Plaintiff's vertebral body heights of the lumbar spine were adequately maintained, and there was mild degenerative anterior wedging associated with endplate spondylosis at T10 and T11. *Id.* The alignment of Plaintiff's lumbar spine was preserved on the neutral view, and there was no excursion of the vertebral column with flexion or

extension. *Id.* Degenerative findings consisted of multilevel degenerative disc space narrowing which was mild at most levels, endplate spondylosis, and hypertrophic facet arthropathy. *Id.* Plaintiff's facet disease became progressively more severe in the caudal direction, culminating at the L5-S1 level. *Id.* Plaintiff also had mild degenerative sclerosis associated with the inferior SI joints, more so on her left than right. *Id.* The overall impression of the examination was multilevel degenerative disc disease, spondylosis, and facet hypertrophy of the lumbar spine. *Id.* A minimal microdiscectomy was recommended on April 6, 2023, to manage Plaintiff's lower back pain.

Plaintiff had experienced edema while she was still working, and this condition increased as the problems in her lower back and lower extremities did. R. 473-74. Plaintiff had difficulties raising her legs because of her back pain, and lower extremity edema was noted on doctor visits throughout 2022 and into 2023. R. 165-66, 2024, 1878-79, 1816, 2194-95, 143-45, 112. Plaintiff's leg swelling, aching, and tiredness in her legs continued in January 2023, despite her use of compression clothing. R. 112.

Plaintiff fell in July 2022, which resulted in exacerbated knee pain. R. 1878-79. On examination, Plaintiff's right knee was noted to have excessive crepitus with active range of motion, while her left knee had excessive crepitus. R. 2150. Plaintiff's knee pain was described by her doctor as a chronic condition that had been present for more than a year and reoccurred several times after its initial onset. R. 2148.

**DISABILITY DETERMINATION**

Following the five-step evaluation process, the reviewing ALJ made the following findings. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, December 30, 2019. R. 21. At step two, the ALJ found that Plaintiff had the following severe impairments: obesity, degenerative disc disease, hypertension and other

cardiovascular disease (including coronary artery disease and peripheral vascular disease/varicose veins), carpal tunnel syndrome, asthma, diabetes mellitus (including neuropathy and gastropathy), obstructive sleep apnea, osteoarthritis and allied disorders (including tendinosis, bursitis, and right rotator cuff injury), anxiety, and headaches. R. 21. At step three, the ALJ found that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22.

Before evaluating Plaintiff at step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations: she could lift and carry 20 pounds occasionally and 10 pounds frequently; she could stand and walk five hours and sit six hours per workday and alternate sit-stand for five minutes duration and thirty minute intervals while remaining on task; she could perform occasional postures of climbing ramps or stairs, balancing, stooping, crouching, crawling or kneeling but not climbing ladders, ropes, or scaffolds and never facing exposure to hazards such as unprotected elevations; she could have frequent use of the upper extremities and lower extremities for such as pushing/pulling and operating controls; she could occasionally reach overhead; she could drive; she could have occasional atmospheric exposure to dust or smoke she could never have exposure to extreme cold; she could use a cane to ambulate; she could sustain simple tasks and respond to simple workplace changes at any frequency; she could have occasional public interaction; and her vision was adequate to maneuver about the workplace and avoid ordinary hazards. R. 23. At step four, with the benefit of testimony from a vocational expert, the ALJ found that Plaintiff could not perform any past relevant work. R. 32. At step five, after considering Plaintiff's age, education, work experience, and residual functioning capacity, the ALJ found that there were jobs that existed in significant numbers in the national

economy which Plaintiff could perform, such as marker, garment sorter, routing clerk, weight tester, dowel inspector, and table worker. R. 33-34. Accordingly, the ALJ found that Plaintiff was not disabled. R. 34.

## ANALYSIS

Plaintiff argues that remand is appropriate because (1) the ALJ erred by failing to adequately explain the basis for his rejection of medical opinions related to Plaintiff's ability to handle and reach; (2) the Appeals Council erred in its evaluation of new and material evidence; and (3) the ALJ's basis for rejecting the medical opinion of Dr. Lee is not supported by substantial evidence.[1] For the following reasons, none of these arguments warrants remand.

1. *The ALJ did not err in discounting medical opinions pertaining to Plaintiff's ability to handle and reach*

Plaintiff argues that the ALJ impermissibly inserted his personal opinion into his decision when he discounted the opinions of agency medical consultants, who opined that Plaintiff would only be capable of occasional reaching and handling with her right arm. (Doc. 15 at 17). When rejecting the opinions of these consultants, the ALJ explained that he did so because the consultants lacked a completed record, while the fuller record at the hearing level was more persuasive, and found that the muscle atrophy that would be expected at the level of disuse alleged by the consultants was not reflected in the record. Plaintiff argues that the medical consultants were aware that there was a lack of atrophy, as the ALJ noted, and that this factor was therefore an

---

[1] Plaintiff also raises an argument in her reply brief that the ALJ did not accurately analyze the medical records related to Plaintiff's strength deficits. To the extent that Plaintiff criticized the ALJ's assessment of the relevant medical evidence throughout the arguments she raised in her initial brief, the Court has considered and addressed Plaintiff's arguments. As a novel argument raised for the first time in the reply brief, this argument does not warrant consideration, as Plaintiff abandoned it by not raising it in her initial brief. *See Adderly v. Comm'r of Soc. Sec.,* 736 F. App'x 838, 839 n.1 (11th Cir. 2018) (finding claimant had abandoned arguments raised for the first time in a reply brief and refusing to address those abandoned arguments).

insufficient basis for rejecting their opinions. *Id.* Further, Plaintiff contends that the ALJ failed to explain what additional evidence in the record at the hearing level justified the rejection of the medical consultants' opinions, leaving an impermissible gap in the record that frustrates judicial review. *Id.*

Under the present standards, the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the [claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, an ALJ must determine how persuasive a medical opinion is by considering its supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)-(5). Supportability and consistency are the most important of these factors, and an ALJ must explain how these factors were considered when assessing the medical opinion in question. 20 C.F.R. § 404.1520c(b)(3). The remaining factors are not required to be addressed explicitly, unless there are equally persuasive medical opinions or prior administrative medical findings at issue. *Id.*

One of the discounted opinions from a state agency medical consultant was that of Dr. J. Ordman, who reviewed Plaintiff in April 2021, when the case was being initially determined. R. 204-08. The second was by Dr. A. Oyewo, who reviewed the case in November 2021 upon reconsideration. R. 221-22. Dr. Ordman opined that Plaintiff was limited in overhead reaching and handling on the right side because of Plaintiff's decreased range of motion. R. 206. Dr. Oyewo also found that Plaintiff was limited to occasional reaching and handling with the right upper extremity. R. 221-22. The ALJ's review of Plaintiff's history with her right upper extremity reflects examination findings that support the medical consultants' opinions at the point in Plaintiff's medical history at which they issued the opinions but notes later evidence that

13

contradicts these opinions. The ALJ cited to Plaintiff's right shoulder diagnostic arthroscopy and right carpal tunnel release in July 2020; Plaintiff's examination in April 2021, in which Plaintiff demonstrated 0/4 reflexes of the biceps, decreased range of motion in her right shoulder and wrist, and 5/5 strength; Plaintiff's January 2022 examination in which she displayed 2+ reflexes, limited range of motion of the right shoulder, slightly reduced strength of her right bicep rated at 4/5, and a normal range of motion and strength; and Plaintiff's June 2022 examination, which revealed full strength throughout Plaintiff's examined areas, including the right upper extremity, with the exception of slightly reduced strength in Plaintiff's left shoulder. R. 26-28.

The medical record at the hearing, which the ALJ expressly found more persuasive than the record at earlier stages of the case and which the ALJ evaluated thoroughly throughout his decision, included evidence that was chronologically unavailable to the medical consultants, specifically later examinations that showed significantly less restrictive findings for Plaintiff's range of motion and strength in her right upper extremity. Although Plaintiff argues that the ALJ's lack of specificity regarding the additional evidence at the hearing level leaves an impermissible gap that frustrates review, it is apparent that the ALJ referred to later medical records that were not present when the medical consultants examined the case. The ALJ included such records in his discussion of Plaintiff's medical history, and the ALJ relied upon those records when determining an RFC that differed from the medical consultant's recommendations. Specifically, the ALJ explained that the RFC findings were supported by records of "normal (5/5) muscle strength throughout the extremities with exception of only slightly reduced (4/5) bilateral shoulder strength, smooth and coordinated gait, 2+ reflexes." R. 32. Similarly, although Plaintiff argues that the medical consultants were also aware of the lack of muscular atrophy in the record, the ALJ

14

had the advantage of being able to review later medical records showing lack of muscular atrophy, which were chronologically impossible for the consultants to review.

In support of her argument, Plaintiff points to *Hill v. Colvin*, a district court decision in which an ALJ's decision was remanded because the ALJ made specific findings about the level to which a claimant needed to elevate his leg that contradicted the level the claimant testified he needed, without any supporting evidence or medical opinion to support the finding. No. 7:13-CV-01238-JEO, 2014 WL 4681908, at *6 (N.D. Ala. Sept. 17, 2014). In *Hill*, the Court found that the ALJ "needed [to rely upon] evidence in the record to support such a finding, whether it came from the medical records, the testimony of a treating or consultative physician, or other credible source." *Id.* Without such support, the ALJ had simply made an impermissible assumption. *Id.* In this case, in contrast to *Hill*, the ALJ did not make a recommendation or medical finding that was without basis in the record. The ALJ referred to specific medical records when disregarding the opinions and when finding the RFC that incorporated Plaintiff's upper right extremity limitations. As such, there was an evidentiary basis for the ALJ's findings, rather than simply the interjection of the ALJ's opinion.

Under the current regulations, ALJs are not required to defer to any medical opinion or prior administrative finding. 20 C.F.R. § 404.1520c(a). The ALJ is required to assess the RFC "based on all of the relevant medical and other evidence" in the record, which the ALJ here did when he evaluated the persuasiveness of the prior administrative agency medical findings and found them not fully persuasive because of later medical evidence and the absence of findings of muscle atrophy in later medical evidence, both of which were unavailable to the medical consultants. *See* 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). Accordingly, there is no basis for remand on this ground.

15

    2. *The Appeals Council did not err in its evaluation of new evidence*

Plaintiff argues that the Appeals Council erred when it rejected new evidence, specifically medical records showing chronic edema in Plaintiff's lower legs from August 2022 through March 2023 and records indicating that Plaintiff's lumbar spinal nerve root impingement was severe enough to justify surgery.

"With a few exceptions, the claimant is allowed to present new evidence at each stage of this administrative process," including before the Appeals Council. *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council "must consider new, material, and chronologically relevant evidence" presented by the claimant. *Id.* Evidence is new when "it was not previously before the ALJ," evidence is material when "there is a reasonable possibility that the new evidence would change the administrative outcome" of the case, and evidence is chronologically relevant if it relates to the time of or before the date of the ALJ's decision. *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *Hargress v. Comm'r. of Soc. Sec.*, 883 F.3d 1302, 1309 (11th Cir. 2018). "When a claimant properly presents new evidence, and the Appeals Council denies review, the Appeals Council must show in its written denial that it has adequately evaluated the new evidence." *Flowers v. Comm'r of Soc. Sec.*, 441 F.App'x. 735, 745 (11th Cir. 2011) (citing *Epps v. Harris,* 624 F.2d 1267, 1273 (5th Cir. 1980)). However, the Appeals Council is not required to make specific findings of fact or provide a detailed explanation of the evidence in question when denying requests for review. *See Parks ex rel. D.P. v. Comm'r. of Soc. Sec.*, 783 F.3d. 847, 852-53 (11th Cir. 2015); *Mitchell*, 771 F.3d at 782-85. The Appeals Council's denial of review of new evidence is a decision that is subject to judicial review. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The Appeals Council found that the new evidence Plaintiff submitted did not show a reasonable probability that it would change the outcome of the decision. R. 2. In her present argument Plaintiff still has not shown that such a change of outcome would be reasonably probable. The new medical evidence as to Plaintiff's edema consists of progress notes from August 29, 2022, through March 23, 2023, from the Albany Vascular Specialist Center. R. 98, 113, 126, 136, 144. These records consistently reflect that Plaintiff experienced bilateral swelling in her legs, had intact cranial nerves, and generalized discoloration from her edema. *Id.* The record that the ALJ reviewed contained one of these reports, dated August 29, 2022, which the ALJ expressly considered. R. 28. The ALJ also noted Plaintiff's diagnoses of peripheral vascular disease and referenced Plaintiff's 1+ edema with generalized discoloration in his decision. *Id.* Plaintiff does not make a compelling argument as to why additional evidence consistent with evidence that the ALJ considered and referenced when making his decision had a reasonable probability of changing the outcome of this decision, nor does it seem probable that Plaintiff could make such an argument. *See Sanders v. Soc. Sec. Admin., Comm'r,* 854 F.App'x 331, 315 (11th Cir. 2021) (records "contain[ing] the same clinical findings evidenced in records already submitted to the ALJ" did not show a reasonably probability that additional evidence would change the outcome of the case).

Similarly, Plaintiff has not shown that the recommendation of a minimal microdiscectomy to manage Plaintiff's recurring pain in her lumbar spine on April 6, 2023, would have changed the outcome of the case. R. 40. Plaintiff referenced such pain in prior medical records and before the ALJ during the hearing. The ALJ considered Plaintiff's subjective complaints regarding her leg pain, her medical history from the time of her alleged onset of disability, and the rest of the evidence that was before him at the time of his decision. R. 25-28. Plaintiff does not show how a note indicating that she required a minimal microdiscectomy in April 2023, after the ALJ issued

his decision, shows that she was disabled from the time of her alleged onset such that there was a reasonable probability that the outcome of this case would have changed on the basis of that information. Accordingly, remand on this basis is not appropriate.

   3. *The ALJ's decision to discount the opinion of Dr. Lee is supported by substantial evidence*

Plaintiff argues that the ALJ's decision to discount the opinion of Dr. Marion Lee is unsupported by substantial evidence. Dr. Lee, Plaintiff's pain management physician, filled out a questionnaire in which she opined that pain and paresthesia would cause Plaintiff to need an inordinate number of breaks or amount of time spent off-task and that Plaintiff needed to elevate her legs to combat swelling to an extent that would be prohibitive to her ability to work. R. 1861-62. More specifically, Dr. Lee asserted that Plaintiff could sit for less than two hours in an eight-hour workday and stand/walk for less than two hours in such a workday. R. 1861. Dr. Lee opined that if Plaintiff had a sedentary job, she would need to raise her legs 80% of the time, she would likely be off-task for a quarter of her time or more in a typical workday, and she would miss work more than four days per month. R. 1861-62. The ALJ found these opinions inconsistent with the evidence of record and did not give "high persuasive influence" to this opinion. R. 28, 32. The ALJ noted that Dr. Lee's opinion was contradicted by other examination reports from Dr. Lee, including one dated January 19, 2022, in which Plaintiff had a smooth and coordinated gate, demonstrated full range of motion in her lower extremities bilaterally, and no pain, crepitus, or contracture was noted. R. 32, 2055. Plaintiff showed 2+ deep tendon reflexes in her upper and lower extremities bilaterally, and her straight leg raising test showed facet tenderness in her left lower back. R. 2055. Plaintiff showed similar results in other examinations with Dr. Lee as to her gait, straight leg raising test, and full range of motion of the lower extremities. R. 1899, 1906,

1946, 1960, 2018, 2049. As the ALJ noted, these findings, which were repeated across multiple examinations, are not consistent with the restrictive limitations that Dr. Lee proposed in the questionnaire.

As the ALJ found, Dr. Lee's restrictive opinion is also contradicted by other evidence in the record, such as findings of normal strength, normal coordination, normal sensation, normal bulk and tone in the upper extremities and lower extremities, and normal gait and station. R. 32. Although Plaintiff argues that this evidence, and the evidence in Dr. Lee's records which contradicted the restrictive limitations that Dr. Lee opined as necessary, is insufficient as a basis to disregard Dr. Lee's opinions, they show that the ALJ's finding is supported by substantial evidence. Although Plaintiff may have preferred that the ALJ cite to or give more weight to additional evidence to the limitations recommended by Dr. Lee, and the Court may not reweigh the evidence considered by the ALJ to match the Plaintiff's preferences. *See Dyer,* 395 F.3d at 1211; *Mitchell v. Comm'r. Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner."). Plaintiff points to other evidence in the record to support her argument for remand on this basis but fails to show that the evidence that the ALJ used to support his findings was insubstantial. Under the Court's standard of review, the claimant "must do more than point to evidence in the record that supports her positions; she must show the absence of substantial evidence supporting the ALJ's conclusion." *Sims v. Comm'r. of Soc. Sec.*, 706 F.App'x. 595, 604 (11th Cir. 2017). "Even if the evidence preponderates against the Commissioner's findings, the court must affirm if the decision reached is supported by substantial evidence." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). Plaintiff has not shown a basis for remand based on a lack of substantial evidence to support the decision.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the Commissioner's decision be **AFFIRMED**.

**SO ORDERED**, this 4th day of September, 2024.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge
